[No. H007702. Sixth Dist. Oct. 9, 1991.]

JOHN W. EWING et al., Plaintiffs and Appellants, v.
CITY OF CARMEL-BY-THE-SEA, Defendant and Respondent.

**COUNSEL**

Noland, Hamerly, Etienne & Hoss and Michael Masuda for Plaintiffs and Appellants.

Donald G. Freeman, City Attorney, for Defendant and Respondent.

Louise H. Renne, City Attorney (San Francisco), Burk E. Deventhal, Assistant City Attorney, McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., and Ann R. Danforth as Amici Curiae on behalf of Defendant and Respondent.

OPINION

ELIA, J.—Plaintiff homeowners challenge the constitutionality of a zoning ordinance prohibiting transient commercial use of residential property for remuneration for less than 30 consecutive days. The trial court upheld the ordinance. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are owners of single-family, residential property zoned R-1 in the City of Carmel-by-the-Sea. Plaintiffs challenge Ordinance No. 89-17, unanimously adopted by the Carmel City Council in May 1989. The ordinance prohibits the "Transient Commercial Use of Residential Property for Remuneration . . . in the R-1 District."

The ordinance defines the "transient commercial use of residential property" as "the commercial use, by any person, of Residential Property for bed and breakfast, hostel, hotel, inn, lodging, motel, resort or other transient lodging uses where the term of occupancy, possession or tenancy of the property by the person entitled to such occupancy, possession or tenancy is for less than thirty (30) consecutive calendar days." The ordinance defines "remuneration" as "compensation, money, rent, or other bargained for consideration given in return for occupancy, possession or use of real property."

The ordinance provides that "[a]ny Person acting as agent, real estate broker, real estate sales agent, property manager, reservation service or otherwise who arranges or negotiates for the use of Residential Property . . ." and "[a]ny Person who uses, or allows the use of, Residential Property in violation [of the ordinance] is guilty of an infraction for each day in which such Residential Property is used, or allowed to be used . . . ." To enforce the ordinance, "[t]he City Attorney may seek legal, injunctive, or other equitable relief . . . ."

Plaintiffs filed this action in June 1989, seeking declaratory and injunctive relief, as well as an award of damages for violation of their civil rights under 42 United States Code section 1983 and an award of attorney fees under 42 United States Code section 1988. In August 1989, the trial court preliminarily enjoined Carmel from enforcement of the ordinance. In October 1990, after trial, the court lifted the preliminary injunction and entered judgment for Carmel, finding the ordinance to be "valid and enforceable."

Plaintiffs appeal.

## DISCUSSION

Plaintiffs contend the doctrine of collateral estoppel bars Carmel from adopting and litigating the validity of Ordinance No. 89-17. Assuming alternatively that collateral estoppel does not apply, plaintiffs contend the ordinance is constitutionally infirm in several respects. They maintain that it violates their rights of privacy and association, substantive and procedural due process, and equal protection.

We begin with plaintiffs' argument regarding collateral estoppel. A decade ago, Carmel enacted a series of ordinances by which it sought to regulate transient rentals. While the final version adopted in 1981 was worded quite differently from the version at issue here, the intent and effect were essentially the same. The 1981 ordinance, like Ordinance No. 89-17, prohibited the rental of residential property for fewer than 30 days.

Some of the same homeowners involved in this suit challenged the earlier ordinances. The trial court permanently enjoined enforcement of the 1981 ordinance, finding it to be "unconstitutional as it invades the rights of association, privacy, and due process. The Court further finds that the Ordinance is over-broad and does not substantially effect its stated goals." Carmel did not appeal. Plaintiffs maintain that Carmel is collaterally estopped from relitigating the matter.

■ Given the difference in wording of the two ordinances, we think it doubtful the doctrine of collateral estoppel applies. In any event, we conclude that this case comes within the public interest exception to the application of the doctrine.

In *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749 [22 Cal.Rptr. 14, 371 P.2d 758], the district liquor control administrator instituted successive proceedings seeking to revoke the beer and wine wholesale license of a chain of retail grocery stores. The first proceeding was resolved in the stores' favor. The second proceeding challenged the stores' operations during a different period of time and under a revised statute. But the stores argued that the administrator was collaterally estopped from relitigating the matter because neither the statute nor the stores' methods of operation had significantly changed since the first proceeding. The Supreme Court observed that res judicata should not be applied when it may have an adverse effect on third parties or when public interest requires that relitigation not be foreclosed. (*Id.* at p. 758.) "In the present case both of these factors, i.e., public interest and effect upon third persons, strongly indicate that the prior determination of the board should not operate to preclude either the department or the courts from reexamining the statute

and applying the correct interpretation . . . ." (*Ibid.*) The court noted that the statute "concerns the public interest in an industry requiring close supervision and that it is an important part of an integrated and rather complex licensing and price regulating system." (*Ibid.*)

In *Chern v. Bank of America* (1976) 15 Cal.3d 866, 872 [127 Cal.Rptr. 110, 544 P.2d 1310], the Supreme Court again "acknowledge[d] . . . a sound judicial policy against applying collateral estoppel in cases which concern matters of important public interest." The court approved plaintiff's relitigation of certain banking practices, noting that federal and state statutes "evidence[] a strong interest in protecting the public through . . . comprehensive scheme[s] of banking and financial regulations." (*Ibid.*) The court concluded: "Given the quality and intensity of the public interest involved, a reexamination of the legal significance of recurring factual events in which the same plaintiff is involved should not be foreclosed under collateral estoppel principles." (*Id.* at p. 873; see also *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 64-65 [266 Cal.Rptr. 139, 785 P.2d 522]; *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)

Similarly, a city and its residents have an abiding and continuing interest in zoning. And a zoning ordinance that does not pass muster today may—due to changed circumstances, changed language, or changed goals—pass muster only a decade later. We conclude that, even if the doctrine of collateral estoppel were otherwise applicable, the public interest exception to the doctrine permits a zoning authority to try again.

■ We turn to the constitutionality of Ordinance No. 89-17, beginning with plaintiffs' argument that the ordinance constitutes a "taking" in violation of the Fifth Amendment. (U.S. Const., 5th Amend. ["No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation."]; *Chicago, Burlington &c. R'd v. Chicago* (1897) 166 U.S. 226, 235-241 [41 L.Ed. 979, 984-986, 17 S.Ct. 581] [Fifth Amendment applies to the states through the Fourteenth Amendment].) Although plaintiffs offer their "taking" argument almost as an afterthought by way of supplemental briefing, we view it as the logical starting point for our constitutional analysis.

The dawn of the 20th century marked the beginning of zoning laws in this country. (*Euclid v. Ambler Co.* (1926) 272 U.S. 365, 386 [71 L.Ed. 303, 310, 47 S.Ct. 114, 54 A.L.R. 1016].) Until then, "urban life was comparatively simple . . . ." (*Ibid.*) But the "great increase and concentration of population" and "the advent of automobiles and rapid transit street railways"

created problems necessitating land-use regulation. (*Id.* at pp. 386-387 [71 L.Ed. at p. 310].) In *Euclid* v. *Ambler Co.*, the Supreme Court confronted for the first time a comprehensive zoning scheme, dividing the Village of Euclid, Ohio, into six use districts, which were further divided according to the permissible size of lots and height of buildings. Plaintiff landowner sought to enjoin enforcement of the Euclid ordinances, contending they deprived him of liberty and property without due process of law and deprived him of equal protection of law.

The Supreme Court declared that zoning regulations must find their justification in the police power, asserted for the public welfare. (*Euclid* v. *Ambler Co.*, *supra*, 272 U.S. at p. 387 [71 L.Ed. at p. 310].) The court noted that the extent of the police power "varies with circumstances and conditions." (*Ibid.*) Likewise, "while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation." (*Ibid.*)

The Supreme Court examined the reasons for comprehensive zoning and, particularly, for setting aside residential districts. In fact, in the court's view, "[t]he serious question in the case arises over the provisions of the ordinance excluding from residential districts, apartment houses, business houses, retail stores and shops, and other like establishments. This question involves the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded." (*Euclid* v. *Ambler Co.*, *supra*, 272 U.S. at p. 390 [71 L.Ed. at pp. 311-312].) The court observed that nonresidential uses may have an increasingly deleterious impact on a residential district "until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed." (*Id.* at p. 394 [71 L.Ed. at p. 313].)

The Supreme Court upheld the Euclid ordinances as a proper exercise of the police power. The court concluded that even if Euclid's reasons for adopting the scheme, such as the preservation of residential areas, "do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." (*Euclid* v. *Ambler Co.*, *supra*, 272 U.S. at p. 395 [71 L.Ed. at p. 314].)

Shortly before *Euclid* was decided, the California Supreme Court dealt with zoning ordinances in *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]. The City of Los Angeles issued plaintiff a permit for construction of a four-family flat. The city then revoked the permit pending adoption of a comprehensive zoning plan that would prohibit construction of a four-family flat on plaintiff's land. Plaintiff challenged the city's authority to enact zoning ordinances.

Like the court in *Euclid*, the court in *Miller* stressed the elasticity of the police power: "as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions. What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power." (*Miller* v. *Board of Public Works, supra*, 195 Cal. at p. 484; see current Cal. Const., art. XI, § 7 [a city may "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].) After concluding that zoning is indeed within the police power, the *Miller* court found that the Los Angeles zoning scheme was reasonably necessary to the public health, safety, morals or general welfare and that the scheme of districting and classification was fair and impartial. (195 Cal. at p. 489.)

The *Miller* court set forth what it considered to be the critical question regarding zoning: "whether or not there may be legally established, as a part of a comprehensive zoning plan, strictly private residential districts from which are excluded and absolutely prohibited general business enterprises, apartments, tenements, and like structures." (*Miller* v. *Board of Public Works, supra*, 195 Cal. at p. 490.) Not only was the *Miller* court's question nearly the same as the "serious question" set forth in *Euclid*, but so also was the answer. "We are of the opinion that it may be done; that the establishment of [residential] districts as a part of a systematic and carefully considered and existing zoning plan is a legitimate exercise of the police power delegated to the municipality." (*Ibid.*)

As we near the end of the 20th century, the courts continue to confront a myriad of zoning disputes. The issues have evolved, often reflecting the increased affluence and mobility of some elements in our modern society. The law has also evolved, but the basic principles survive. ▮ Zoning ordinances are still presumptively constitutional. (*Goldblatt* v. *Hempstead* (1962) 369 U.S. 590, 594 [8 L.Ed.2d 130, 133-134, 82 S.Ct. 987]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604-605 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) But "[t]he application of a general zoning law to particular property effects a taking if

the ordinance does not substantially advance legitimate state interests, see *Nectow* v. *Cambridge*, 277 U.S. 183, 188 (1928), or denies an owner economically viable use of his land, see *Penn Central Transp. Co.* v. *New York City*, 438 U.S. 104, 138, n. 36 (1978). The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. Although no precise rule determines when property has been taken, see *Kaiser Aetna* v. *United States*, 444 U.S. 164 (1979), the question necessarily requires a weighing of private and public interests." (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260-261 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138].)

In passing Ordinance No. 89-17, Carmel sought to implement goals set forth in its 1988 revised general plan. (See Gov. Code, § 65860 [zoning ordinance must be consistent with general plan].) Objective O1-12 states, for example: "Intensify enforcement of zoning codes to maintain the residential character of the city." Policy P1-37 provides: "Review and develop measures to restrict commercial short term rental of single family residences in the R-1 district." Policy P3-12 provides: "Preserve existing permanent housing and maintain the vital residential character of Carmel-by-the-Sea. Prohibit expansion of visitor oriented commercial uses such as transient rentals." Policy P3-18 provides: "Encourage the conversion of commercial transient housing to housing for permanent residents."

In the findings and purposes appended to Ordinance No. 89-17, the city council observed: "The purpose of the R-1 District is to provide an appropriately zoned land area within the City for permanent single-family residential uses and structures and to enhance and maintain the residential character of the City." The council found that the use of single-family residential property for transient lodging was a commercial use inconsistent with the purpose of the R-1 District. Moreover, "[c]ommercial use of single-family residential property for such purposes create unmitigatable, adverse impacts on surrounding residential uses including, but not limited to, increased levels of commercial and residential vehicle traffic, parking demand, light and glare, and noise detrimental to surrounding residential uses and the general welfare of the City. Such commercial use may increase demand for public services, including, but not limited to, police, fire, and medical emergency services, and neighborhood watch programs."

Plaintiffs submit declarations intended to show that transient use of R-1 property does not create the "unmitigatable, adverse impacts" cited by the council. A paralegal reports she examined the Carmel Police Department's press log for the past two years and found just one "disturbing the peace" complaint and only five complaints of "blocked driveway" in the R-1

District. She found no complaints regarding "light and glare," "noise," or "transient rental use." The operator of a residential housecleaning service in the R-1 District for the past two years declares that he cleans "vacation homes" no differently from "permanent homes." He parks his car in the driveway of the house being cleaned and makes no more noise than would a homeowner cleaning his own house. He has never had any complaints from neighbors or from Carmel regarding activities connected to his service. John W. Ewing, the lead plaintiff in this action, declares that his home in the R-1 District is vacant approximately 40 to 50 percent of the time. When rented through a broker, it is occupied for at least one week by no more than one family or two couples. No maid, linen, or food service is provided. Ewing has never had complaints from his neighbors or from Carmel regarding use of his property.

While plaintiffs have presented some evidence to counter the council's finding that transient rentals increase traffic, parking demand, light and glare, noise, and the need for public services, they have not met Carmel's chief purpose in adopting Ordinance No. 89-17—"to provide an appropriately zoned land area within the City for permanent single-family residential uses and structures and to enhance and maintain the residential character of the City."

In *Miller* and *Euclid*, the highest courts of this state and of the land recognized that maintenance of the character of residential neighborhoods is a proper purpose of zoning. The California Supreme Court employed language now a bit dated yet plainly relevant to the case at hand: "[W]e think it may be safely and sensibly said that justification for residential zoning may, in the last analysis, be rested upon the protection of the civic and social values of the American home. The establishment of such districts is for the general welfare because it tends to promote and perpetuate the American home. It is axiomatic that the welfare, and indeed the very existence of a nation depends upon the character and caliber of its citizenry. The character and quality of manhood and womanhood are in a large measure the result of home environment. The home and its intrinsic influences are the very foundation of good citizenship, and any factor contributing to the establishment of homes and the fostering of home life doubtless tends to the enhancement not only of community life but of the life of the nation as a whole." (*Miller* v. *Board of Public Works, supra,* 195 Cal. at p. 493.) The court observed that with home ownership comes stability, increased interest in the promotion of public agencies, such as schools and churches, and "recognition of the individual's responsibility for his share in the safeguarding of the welfare of the community and increased pride in personal achievement which must come from personal participation in projects looking toward community betterment." (*Ibid.*)

It stands to reason that the "residential character" of a neighborhood is threatened when a significant number of homes—at least 12 percent in this case, according to the record—are occupied not by permanent residents but by a stream of tenants staying a weekend, a week, or even 29 days. Whether or not transient rentals have the other "unmitigatable, adverse impacts" cited by the council, such rentals undoubtedly affect the essential character of a neighborhood and the stability of a community. Short-term tenants have little interest in public agencies or in the welfare of the citizenry. They do not participate in local government, coach little league, or join the hospital guild. They do not lead a scout troop, volunteer at the library, or keep an eye on an elderly neighbor. Literally, they are here today and gone tomorrow—without engaging in the sort of activities that weld and strengthen a community.

Plaintiffs attempt to equate this case with *Parr* v. *Municipal Court* (1971) 3 Cal.3d 861 [92 Cal.Rptr. 153, 479 P.2d 353], in which the Supreme Court confronted a Carmel zoning ordinance prohibiting, among other things, sitting or lying upon a public lawn. The ordinance was accompanied by a "Declaration of Urgency" explaining that it was geared toward " 'an extraordinary influx of undesirable and unsanitary visitors to the City, sometimes known as "hippies" . . . .' " (*Id.* at p. 863.) The court concluded that the ordinance violated appellant's right of equal protection by discriminating against a social class. Plaintiffs quote from the concurrence in *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 825 [226 Cal.Rptr. 81, 718 P.2d 68]: "An impermissible elitist concept is invoked when a community constructs a legal moat around its perimeter to exclude all or most outsiders." Plaintiffs argue that the ordinance challenged in *Parr* and Ordinance No. 89-17 demonstrate Carmel's desire to build a legal moat. The ordinance challenged in *Parr* was struck down; thus, plaintiffs reason, Ordinance No. 89-17 should meet the same fate.

We view the ordinance here as very different from that in *Parr*, in which Carmel sought to ban entirely a certain element from the community. By Ordinance No. 89-17, Carmel does not seek entirely to ban short-term visitors. Indeed, we suspect that short-term visitors provide an economic boon that Carmel would be loath to eliminate. Rather, Carmel wishes simply to confine the accommodations for short-term visitors to areas outside the R-1 District—where, according to the record, there are approximately 950 such transient units.

Blessed with unparalleled geography, climate, beauty, and charm, Carmel naturally attracts numerous short-term visitors. Again, it stands to reason that Carmel would wish to preserve an enclave of single-family homes as the heart and soul of the city. ██ We believe that this reason alone is

"sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." (*Euclid* v. *Ambler Co.*, *supra*, 272 U.S. at p. 395 [71 L.Ed. at p. 314].)

■ A zoning ordinance does not constitute a taking simply because it narrows a property owner's options. In fact, "[m]any zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property." (*Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 498 [94 L.Ed.2d 472, 496, 107 S.Ct. 1232]; see, e.g., *Griffin Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256 [217 Cal.Rptr. 1, 703 P.2d 339] [condominium conversion ordinance]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001] [rent control law].) Justice Holmes stated the test in *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 413 [67 L.Ed. 322, 325, 43 S.Ct. 158, 28 A.L.R. 1321]: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts."

■ Ordinance No. 89-17 leaves plaintiffs with several economically viable uses of their property. Plaintiffs may live in their homes permanently or occasionally. They may rent their homes for remuneration for at least 30 days. They may allow others to use their homes, without remuneration, for any length of time. They may sell their homes or otherwise encumber them. The only thing they may not do, under the terms of Ordinance No. 89-17, is operate their homes as "bed and breakfast, hostel, hotel, inn, lodging, motel, resort or other transient lodging . . . ." The intrusion into plaintiffs' bundle of ownership rights—"the extent of the diminution," in Justice Holmes's words—is minimal and far outweighed by the public interest in enhancing and maintaining permanent residential areas.

■ Plaintiffs insist, however, that Carmel has acted arbitrarily by restricting transient commercial use of residential property while other commercial uses are allowed. Carmel Ordinance No. 17.24.020 permits home occupations in the R-1 District, including "painting and related graphics, music, dance, dramatics, sculpture, writing, photography, weaving, ceramics,

needlecraft, jewelry, glass and metal crafts." Carmel Ordinance No. 17.24.030 allows the issuance of use permits for private kindergartens and nursery schools in the R-1 District. Plaintiffs contend that these uses result in even greater "unmitigatable, adverse impacts" than the uses prohibited by Ordinance No. 89-17.

Whether or not home occupations increase traffic and parking problems and other adverse impacts, they do not threaten the basic character of a residential neighborhood. Rather, they strengthen the community by fostering the talents of its residents. (See *County of Butte* v. *Bach* (1985) 172 Cal.App.3d 848, 865 [218 Cal.Rptr. 613] [home occupation exception in a zoning ordinance "implicitly premised upon expectations that the number and distribution of such encroachments will not be intolerable and that persons who live where they work are likely to have less detrimental impact than nonresidents"].) Similarly, local kindergartens and nursery schools keep toddlers close to home, enhancing the quality of life and the stability of the community.

Plaintiffs also complain that Carmel has drawn the line arbitrarily by permitting rentals of 30 consecutive days but not 29. Line drawing is the essence of zoning. Sometimes the line is pencil-point thin—allowing, for example, plots of one-third acre but not one-fourth; buildings of three floors but not four; beauty shops but not beauty schools. In *Euclid,* the Supreme Court recognized that "in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation." (*Euclid* v. *Ambler Co., supra,* 272 U.S. at p. 389 [71 L.Ed. at p. 311].) Nonetheless, the line must be drawn, and the legislature must do it. Absent an arbitrary or unreasonable delineation, it is not the prerogative of the courts to second-guess the legislative decision. (See *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 8 [39 L.Ed.2d 797, 803-804, 94 S.Ct. 1536]; *Berman* v. *Parker* (1954) 348 U.S. 26, 35-36 [99 L.Ed. 27, 39-40, 75 S.Ct. 98].)

In this case, it appears that Carmel did not wish to discourage month-to-month tenancies. Indeed, long-term tenants may create as stable a community as resident homeowners. Through Ordinance No. 89-17, Carmel wished to curtail only short-term occupancies for remuneration. We believe that the 30-day cutoff is not arbitrary but, rather, is reasonably linked to that goal. (See Rev. & Tax. Code, § 7280 [establishing 30-day cutoff for city or county tax upon short-term occupancy in "hotel, inn, tourist home or house, motel, or other lodging"]; Civ. Code, § 1943 [tenancy presumed to be month-to-month unless otherwise designated in writing].)

Plaintiffs offer yet another Fifth Amendment argument, contending that Ordinance No. 89-17 is unconstitutionally vague and overbroad.

■ Indeed, "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process." (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) In *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294], the Supreme Court observed that a vague law may offend "several important values." First, the person of ordinary intelligence should have a reasonable opportunity to know what is prohibited. A vague law may trap the innocent by not providing fair warning. Second, a vague law impermissibly delegates the legislative job of defining what is prohibited to policemen, judges, and juries, creating a danger of arbitrary and discriminatory application. Third, a vague law may have a chilling effect, causing people to steer a wider course than necessary in order to avoid the strictures of the law.

Yet, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." (*Grayned* v. *City of Rockford, supra,* 408 U.S. at p. 110 [33 L.Ed.2d at pp. 228-229], fn. omitted.) ■ "Often the requisite standards of certainty can be fleshed out from otherwise vague statutory language by reference to any of the following sources: (1) long established or commonly accepted usage; (2) usage at common law; (3) judicial interpretations of the statutory language or of similar language; (4) legislative history or purpose. [Citation.] While the dangers of discriminatory enforcement and ex post facto punishment posed by vague penal provisions must be considered in construing statutory language [citation], liberal regard will be given to legislative intent so as to give effect to the salutary objects of the particular law. [Citations.] Zoning regulations are no exception to the foregoing principles. [Citation.]" (*Sechrist* v. *Municipal Court* (1976) 64 Cal.App.3d 737, 745 [134 Cal.Rptr. 733].) "In fact, a substantial amount of vagueness is permitted in California zoning ordinances . . . ." (*Novi* v. *City of Pacifica* (1985) 169 Cal.App.3d 678, 682 [215 Cal.Rptr. 439] [antimonotony ordinance]; see also *Guinnane* v. *San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732 [257 Cal.Rptr. 742] [residential character ordinance].)

In his declaration, plaintiff John Ewing criticizes Ordinance No. 89-17 as follows: "I do not know if the term 'remuneration' prohibits house swaps, house-sitting, pet-sitting, or allowing someone to use my house in return for bartered consideration, dinner, or house or yard work. I also do not know whether the 'remuneration' has to be viewed from my point of view or my guests'. For example, many of my guests agree to use my Carmel home, either alone or when I am also present, only on condition they be allowed to do something for me in return. In some cases, I consider this clearly a 'bargained for consideration.' In other cases I do not, but I know my guests

consider it bargained for consideration. Am I violating the ordinance in both cases, or only those in which I consider the deal to have been 'bargained for?' If it is only when I consider it 'bargained for,' how will Carmel distinguish between different owner's interpretations of their friends' or guests' insistences that they be allowed to do something for the homeowner in exchange for the right to occupy the residence?"

In fact, Carmel's attorney acknowledged at trial that house-sitting and house swapping could be viewed as "bargained for consideration." Even a host and his overnight guest who treats him to dinner might find themselves on the wrong side of the ordinance.

At this point, we do not presume to know how expansively Carmel will interpret Ordinance No. 89-17. Although a very broad reading of "remuneration" or "bargained for consideration" might lead to absurd applications, as Carmel's attorney admitted, the legislative purpose is clearly to prohibit transient *commercial* use of residential property. The word "commercial" appears repeatedly at every critical juncture in the ordinance. As the court observed with respect to zoning matters in *Sechrist* v. *Municipal Court*, *supra*, 64 Cal.App.3d at page 746, "[t]he term 'residential' is normally used in contradistinction to 'commercial' or 'business.'" (See also *City of Beverly Hills* v. *Brady* (1950) 34 Cal.2d 854, 856 [215 P.2d 460] ["Whether the questioned activities amount to the conduct of a business depends upon the adopted definition of that word and the primary intent of the zoning restrictions."].)

Plaintiffs complain that Carmel's use of the word "commercial" in Ordinance No. 89-17 is "self-serving, unrealistic, and legally incorrect." To the contrary, we view Carmel's repeated use of the word as strong evidence that Carmel intends only to prevent homeowners in the R-1 District from operating like a "bed and breakfast, hostel, hotel, inn, lodging, motel, resort or other transient lodging . . . ." In our experience, such establishments do not normally engage in house swaps, house-sitting, pet-sitting, or permit customers to pay by treating the proprietor to dinner or by doing yard work. Given the repeated use of the word "commercial," we do not discern an intention by Carmel to police bread-and-butter gifts. We believe that Ordinance No. 89-17 is sufficiently clear to allow people of common intelligence to understand its meaning.

Finally, we turn to plaintiffs' contention that Ordinance No. 89-17 violates their constitutional rights of substantive due process and equal protection. They argue first that the ordinance infringes upon their rights of freedom of association and of privacy guaranteed by the federal and state Constitutions. (See U.S. Const., 1st, 3d, 4th, 5th, & 9th Amends.; *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]; Cal.

Const., art. I, § 1; *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].) Because these are fundamental rights (see *Griswold* v. *Connecticut, supra*, 381 U.S. at pp. 484-486 [14 L.Ed.2d at pp. 514-516] [privacy]; *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 460-461 [2 L.Ed.2d 1488, 1498-1499, 78 S.Ct. 1163] [association]), they contend the ordinance is not presumed valid, as would be the normal zoning ordinance. Rather, they maintain that Carmel has the burden of demonstrating that the infringement upon constitutional rights is necessary to meet a compelling public need and that the ordinance is the least intrusive means of meeting that need. (See *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 499 [52 L.Ed.2d 531, 537-538, 97 S.Ct. 1932]; *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 213 [211 Cal.Rptr. 398, 695 P.2d 695].)

Second, plaintiffs argue that even if the ordinance does not infringe upon fundamental rights, it still violates substantive due process and equal protection because it is not rationally related to the goals sought to be achieved. (See *Village of Belle Terre* v. *Boraas, supra*, 416 U.S. at p. 8 [39 L.Ed.2d at pp. 803-804]; *Roman Cath. etc. Corp.* v. *City of Piedmont* (1955) 45 Cal.2d 325, 331 [289 P.2d 438].)

We have already determined that the ordinance is rationally related to the stated goal. Carmel wishes to enhance and maintain the residential character of the R-1 District. Limiting transient commercial use of residential property for remuneration in the R-1 District addresses that goal. We have also concluded there is a rational basis for the 30-day cutoff and for the allowance of home occupations in the R-1 District despite the prohibitions contained in Ordinance No. 89-17. Plaintiffs rely upon *Roman Cath. etc. Corp.* v. *City of Piedmont, supra*, in which the California Supreme Court struck down an ordinance prohibiting private schools in an area where public schools were allowed, finding no rational basis for distinguishing one from the other. The case is inapposite. Carmel has not prohibited one kind of transient commercial use while permitting another comparable use. Rather, through Ordinance No. 89-17, Carmel has prohibited all transient commercial use of residential property for remuneration.

Further, a review of a few of the cases relied upon by plaintiffs shows that this case is not within the ambit of association or privacy rights. Plaintiffs rely particularly upon *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219], in which the California Supreme Court struck down an ordinance prohibiting housekeeping units of more than five persons unrelated by blood, marriage, or adoption. The court concluded that there was no nexus between the "rule-of-five" and the city's goal of maintaining residential character. " 'The fatal flaw in attempting to maintain a stable residential neighborhood through the use of criteria based upon biological or legal relationships is that such classifications operate to prohibit a plethora of uses which pose no threat to the

accomplishment of the end sought to be achieved. . . . As long as a group bears the "generic character of a family unit as a relatively permanent household," it should be equally as entitled to occupy a single family dwelling as its biologically related neighbors.' " (*Id.* at p. 134, quoting from *State* v. *Baker* (1979) 81 N.J. 99 [405 A.2d 368, 371-372].)

In *Robbins* v. *Superior Court, supra*, the California Supreme Court concluded that plaintiffs were likely to succeed on their claim that certain aspects of the defendant county's general assistance program were unconstitutional. Under the program, single, employable residents were not eligible for cash benefits but only for "in-kind" benefits, meaning food and shelter at a county facility. Because the assistance program likely interfered with plaintiffs' rights of association and privacy, the court held that the trial court erred in refusing to issue a preliminary injunction.

In *Park Redlands Covenant Control Committee* v. *Simon* (1986) 181 Cal.App.3d 87 [226 Cal.Rptr. 199], the court declared unconstitutional a private restrictive covenant that limited the maximum number of occupants per unit to three. In *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89 [130 Cal.Rptr. 375], the court declared unconstitutional a county housing authority policy prohibiting a low-income public housing tenant from living with a member of the opposite sex to whom the tenant was not related by blood, marriage, or adoption. In each case, the court determined that the rule interfered with the complainants' right to privacy by restricting with whom they could live.

In *Moore* v. *East Cleveland*, the United States Supreme Court struck down an ordinance limiting the occupancy of a single dwelling unit to members of a single "family" and defining "family" so as to prohibit even related individuals from living together in certain instances. When the government so intrudes upon family living arrangements, the court declared, "the usual judicial deference to the legislature is inappropriate." (*Moore* v. *East Cleveland, supra*, 431 U.S. at p. 499 [52 L.Ed.2d at p. 537].) The court distinguished the case from *Village of Belle Terre* v. *Boraas*, in which the court upheld an ordinance that limited the ability of unrelated individuals to live together but placed no limitation upon those related by blood, marriage, or adoption. The court noted that the Belle Terre ordinance promoted "family needs" and "family values." (*Village of Belle Terre* v. *Boraas, supra*, 416 U.S. at p. 9 [39 L.Ed.2d at p. 804].) Achieving just the opposite, the East Cleveland ordinance "slic[ed] deeply into the family itself." (*Moore* v. *East Cleveland, supra*, 431 U.S. at p. 498 [52 L.Ed.2d at p. 538].)

Ordinance No. 89-17 differs sharply from the ordinances, policies, and covenants declared unconstitutional in the cases cited by plaintiffs. The rule

challenged in each of those cases prohibited cohabitation by certain people or groups of people. In effect, each rule governed with whom residents could reside, based upon the number of people or upon their familial relationship. The ordinance here does no such thing. Plaintiffs are free to live with whom they wish. They may entertain whom they wish. They may rent to whom they wish—the only condition being that the occupancy, possession, or tenancy last at least 30 consecutive calendar days. As the Supreme Court emphasized in *City of Santa Barbara v. Adamson, supra,* 27 Cal.3d at page 133, "*In general, zoning ordinances are much less suspect when they focus on the use than when they command inquiry into who are the users.*" The ordinance here does just that. It prohibits the transient commercial use of residential property for remuneration in the R-1 District—regardless of who the parties are. Because Ordinance No. 89-17 focuses on use, rather than users, it does not violate fundamental rights and does not warrant stricter scrutiny than is normally accorded zoning laws.

Even if their privacy rights are not violated by Ordinance No. 89-17 itself, plaintiffs fear the means by which Carmel will detect violations of the ordinance. Plaintiffs allege that Carmel attempted to enforce earlier versions of the ordinance by monitoring houses and license plate numbers and by dispatching letters and police officers to the homes of suspected violators. Plaintiffs contend such methods would violate their right to privacy. Just as we do not presume to know precisely how Carmel will interpret Ordinance No. 89-17, we also do not presume to know precisely how Carmel will detect violators. But we shall not assume that Carmel intends to invade constitutional rights. Review of Carmel's specific application and enforcement of the ordinance, if appropriate, must await another day. (See *Euclid v. Ambler Co., supra,* 272 U.S. at pp. 395-397 [71 L.Ed. at pp. 313-315]; *People v. Wingo* (1975) 14 Cal.3d 169, 180 [121 Cal.Rptr. 97, 534 P.2d 1001] ["A statute valid on its face may be unconstitutionally applied."].)

Because we conclude that Carmel has not violated plaintiffs' constitutional rights, we do not reach their arguments under 42 United States Code sections 1983 and 1988.

## DISPOSITION

The judgment is affirmed.

Capaccioli, Acting P. J., and Cottle, J., concurred.

A petition for a rehearing was denied November 5, 1991, and appellants' petition for review by the Supreme Court was denied January 8, 1992. Baxter, J., was of the opinion that the petition should be granted.