[No. A075859. First Dist., Div. Two. Dec. 8, 1997.]

GILBERT KUCERA et al., Plaintiffs and Appellants, v.
TIBERIO LIZZA, Defendant and Respondent.

COUNSEL

Bruce C. Osterman and David Edward May for Plaintiffs and Appellants.

Gary T. Ragghianti, City Attorney, Lisa A. Goldfien, Deputy City Attorney, and Ann R. Danforth as Amici Curiae on behalf of Plaintiffs and Appellants.

Brekhus, Williams, Wester & Hall, Peter B. Brekhus and Linda J. Philipps for Defendant and Respondent.

OPINION

LAMBDEN, J.—We consider the validity of an ordinance of the Town of Tiburon which preserves views and sunlight against unreasonable obstruction by tree growth. Gilbert and Heidi Kucera, owners of an apartment building, used the ordinance to attempt resolution of a dispute with neighboring apartment building owner Tiberio Lizza over eight Monterey Pines which had grown to obstruct their view. Reaching no resolution through less formal procedures dictated by the ordinance, they brought this superior court action against Lizza, also under the ordinance, to compel restoration of their views.

The case presented the trial court with issues of whether the obstruction was unreasonable under the ordinance and, more fundamentally, whether the ordinance was invalid. In a bifurcated trial on stipulated facts, the court gave judgment for Lizza on the latter ground. It held the ordinance unconstitutional and "void" as (1) preempted by state law governing the creation of servitudes and land burdens, and (2) an arbitrary and unreasonable exercise of the police power.

The Kuceras appeal, supported in their arguments by friend of the court briefs from the Town of Tiburon (Tiburon or the town) and the City of Belvedere, Tiburon's brief being joined by 71 other California cities.[1]

BACKGROUND

*The ordinance*

The ordinance, entitled "View and Sunlight Obstruction from Trees," comprises chapter 15 of the Tiburon Municipal Code (hereafter cited only by section). Its purpose is to establish "the right of persons to preserve views or sunlight which existed at any time since they purchased or occupied a property from unreasonable obstruction by the growth of trees" (§ 15-1.A) and "a process" to seek "restoration" of views and sunlight (§ 15-1.B).

Supporting findings or "principles" include these: "residents, property owners, and businesses cherish their outward views from the Tiburon Peninsula, and . . . cherish the benefits of plentiful sunlight reaching their buildings and yards" (§ 15-1.1); "outward views and plentiful sunlight reaching property contribute greatly to the quality of life in Tiburon, and promote the general welfare of the entire community" (*ibid.*); desires for "beautiful and plentiful landscaping" occasion inevitable conflicts (§ 15-1.2); owners and residents "should maintain trees on their property in a healthy condition for both safety reasons and for preservation of sunlight and outward views" (§ 15-1.3); a process for resolving disputes, and guidelines for preserving and restoring views and sunlight, are needed (§ 15-1.4); parties to disputes "should act reasonably to resolve [them] through friendly communication, thoughtful negotiation, compromise, and other traditional means" before resorting to the procedures established in the ordinance (§ 15-1.5).

The ordinance grants persons "the right to preserve and seek restoration of views or sunlight which existed at any time since they purchased or occupied a property, when such views or sunlight are from the primary living area or active use area and have subsequently been unreasonably obstructed by the

---

[1] The 71 other cities are, alphabetically, Albany, Atherton, Atwater, Banning, Benicia, Berkeley, Brentwood, Burbank, Calabasas, Camarillo, Carlsbad, Carmel-by-the-Sea, Chico, Chino, Claremont, Coachella, Culver City, Del Mar, Dinuba, El Cajon, Eureka, Exeter, Fairfax, Hayward, Hillsborough, Huron, Indian Wells, King City, Lafayette, Lindsay, Livermore, Los Altos, Malibu, Merced, Montebello, Monterey, Moorpark, Napa, Nevada City, Oakland, Ojai, Orange Cove, Orinda, Palm Desert, Palos Verdes Estates, Pico Rivera, Piedmont, Pleasant Hill, Point Arena, Porterville, Rancho Palos Verdes, Redding, Redlands, Rolling Hills, Rolling Hills Estates, Ross, Sacramento, San Anselmo, San Diego, San Juan Capistrano, San Luis Obispo, San Pablo, Santa Clara, Signal Hill, Solana Beach, St. Helena, Tulare, Visalia, Walnut, Walnut Creek, and Woodlake.

growth of trees." (§ 15-3.) Concomitantly, "No person shall plant, maintain, or permit to grow any tree which unreasonably obstructs the view from, or sunlight reaching, the primary living area or active use area of any other parcel of property" within the town (§ 15-4(a)), and "[b]ecause the maintenance of views and sunlight benefits the general welfare" of the town, such obstruction also constitutes "a public nuisance" (§ 15-4(b)). Prescribed procedures must be followed to establish rights under the ordinance, but private parties also retain their "right to seek remedial action for imminent danger" caused by trees. (§ 15-3.)

The ordinance defines pertinent terms. Among them: "View" generally means a medium or long-range view; "Sunlight" means direct or indirect light; "Tree" includes not just trees in the usual sense, but shrubs, hedges and bushes which might obstruct views or sunlight; a "Primary Living Area" is a part of a residence from which views are observed most often; an "Active Use Area" is a most frequently occupied portion of a commercial building from which views are available. (§ 15-2.)

Criteria for determining what constitutes an "unreasonable obstruction" take into account the extent of preexisting views and their obstruction, now and at tree maturity, the quality of those views, any interference with preexisting solar energy systems and the extent to which factors other than tree growth are responsible. (§ 15-5.)

"Restorative Action" means any specific requirement to resolve a tree dispute (§ 15-2) and contemplates a progression of actions designed to produce the least intrusive solution. The specified hierarchy, least to most intrusive, is: trimming; thinning (removal of branches to improve visibility) or windowing (creation of openings through thinning); topping; removal with replacement plantings; and removal without replacement. (§§ 15-2, 15-7.) The maximum limit of restorative action is "the documentable extent of view or sunlight existing at any time during the tenure" of the complaining owner or occupant, and the health of any affected tree must be considered. (§ 15-7.) In addition, restorative action "may include written conditions (including ongoing maintenance), and directions as to appropriate timing of such actions, and may be made to run with the land and apply to successors in interest. . . ." (*Ibid.*)

Restorative action is also affected by the type of tree. To alter or remove a "Protected Tree"—heritage (specified trunk circumference), oak (specified varieties) or dedicated (through resolution of the town council)—requires a permit (§ 15-8) and is disfavored under the governing criteria (§ 15-6(I)). By contrast, the ordinance favors "aggressive action" for "Undesirable Trees":

"By reason of their tall height at maturity, rapid growth, dense foliage, shallow root structure, flammability, breakability, or invasiveness, certain types of trees have been deemed 'undesirable' by the Town, including Blue Gum Eucalyptus, Coast Redwood, Monterey Pine, Monterey Cypress trees, or any other tree which generally grows more than 3 feet per year in height and is capable of reaching a height of over 35 feet at maturity. When considering restorative action for 'undesirable' trees, aggressive action is preferred." (§ 15-8.)

Criteria for appropriate restorative action also call for consideration of any hazard the tree poses (e.g., fire or falling limbs), its growth rate and maintenance requirements, its aesthetic qualities and location, soil stability, privacy and wind screening, energy conservation and climate control, and wildlife habitat. (§ 15-6.) Other guidelines stress the tree's protected or undesirable status, the avoidance of stump growth, the action hierarchy already noted (*ante*), and maintenance (ongoing maintenance requirements "are strongly recommended . . . in order to achieve lasting preservation" of views or sunlight). (§ 15-8.) The guidelines also provide: *"Permanence.* Conditions of Restorative Action should be recorded and run with the land to help guarantee permanent preservation of pre-existing views and sunlight." (*Ibid.*)

The ordinance imposes a progression of informal and alternative dispute resolution before resort to litigation. "Initial Reconciliation" calls for written notice to and personal discussions with the tree owner plus community association assistance, the aim being a mutually agreeable solution. Failing in that, the party must propose voluntary mediation, which is informal and cannot yield binding orders under the ordinance. (§ 15-9.) Should mediation fail or be declined by the tree owner, the party must present the owner with a written claim containing specified evidence and proposed restorative action (§ 15-10.) and offer voluntary, binding arbitration. The aim is a written report by the agreed arbitrator containing findings on unreasonable obstruction and restorative action. (§ 15-11.) Costs of mediation and arbitration are shared equally unless the participants agree otherwise or empower the mediator or arbitrator to allocate costs. Costs of restorative action are set by mutual agreement, mediation or arbitration, as the case may be. (§ 15-13.)

Should the owner decline binding arbitration, "then civil action may be pursued by the Complaining Party for resolution of the view or sunlight obstruction dispute under the rights and provisions of this Chapter." (§ 15-12.) Copies of "the lawsuit" and any order or settlement are filed with the town attorney (§ 15-12), and costs of litigation and restorative action are determined by the court or by settlement (§ 15-13).

*The facts*

According to the stipulated facts, Lizza purchased his property in 1978 and the Kuceras theirs in 1990. Lizza's is across the street and downhill from the Kuceras', and trees on his property have grown, since the Kuceras purchased their property, to obstruct their views of San Francisco Bay and the Marin County mainland from primary living or active use areas. The ordinance was passed in December 1991. The Kuceras initiated the ordinance's informal dispute resolution process in June 1992 and have satisfied all of its procedures. Lizza refused to participate in mediation (or, evidently, arbitration). He had no use or building or other land entitlement applications pending in Tiburon.

## DISCUSSION

### I. *General police power to regulate views and sunlight*

 Numerous issues are presented, and we start our analysis with one on which the parties appear to disagree whether they disagree: Is it within Tiburon's police powers to preserve views and sunlight by regulating tree growth? Lizza insists "[t]his is not a case about a local municipality's right to regulate for public safety or aesthetic purposes," yet his unreasonable-exercise claims—nominally limited to preemption, property rights and the like—repeatedly attack the ordinance as lacking a true public purpose and otherwise question the ordinance's legitimacy as public policy. He poses in essence a substantive due process claim, and it is therefore helpful to explore this basic question, which the Kuceras and Tiburon insist is very much at issue.

 The constitutional measure by which we judge the validity of a land use ordinance assailed as exceeding municipal authority under the police power is whether it has a real or substantial relation to the public health, safety, morals or general welfare. Conversely, it is *un*constitutional only if its provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Guinnane* v. *San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732, 740-741 [257 Cal.Rptr. 742] (*Guinnane*).)

 The Kuceras concede "safety considerations are peripheral" to the ordinance, and we agree. It identifies a goal of maintaining trees "in a healthy condition for both safety reasons and for preservation of sunlight and

outward views" (§ 15-1.3) and boosts safety by urging that all restorative action on trees to be preserved "be carried out in accordance with standards established by the International Society of Arboriculture . . ." (§ 15-7). But safety is evidently incidental to the goal of preserving light and views. The ordinance considers the effects of tree shade on solar energy systems (§ 15-5(c)) and may contribute to the health of residents by preserving natural light and views (cf. *Taliaferro* v. *Salyer* (1958) 162 Cal.App.2d 685, 691 [328 P.2d 799]), but Lizza is correct to say the ordinance, in its stated objectives, is mainly concerned with aesthetic considerations.

This does not void the ordinance. "It is well settled that the state may legitimately exercise its police powers to advance aesthetic values. . . . 'The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary.' " (*City Council* v. *Taxpayers for Vincent* (1984) 466 U.S. 789, 805 [104 S.Ct. 2118, 2129, 80 L.Ed.2d 772], citations omitted; *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 886 [50 Cal.Rptr.2d 242, 911 P.2d 429].) Those values also change over time, flexing the elastic concept of police power. "What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power." (*Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 484 [234 P. 381, 38 A.L.R. 1479]; *Ewing* v. *City of Carmel-by-the-Sea* (1991) 234 Cal.App.3d 1579, 1588 [286 Cal.Rptr. 382].) Today, aesthetic purposes alone can justify assertion of the police power. (*Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848, 860-861 [164 Cal.Rptr. 510, 610 P.2d 407], reversed on other grounds *Metromedia, Inc.* v. *San Diego* (1981) 453 U.S. 490 [101 S.Ct. 2882, 69 L.Ed.2d 800].) "Virtually every city in this state has enacted zoning ordinances for the purpose of improving the appearance of the urban environment and the quality of metropolitan life." (*Metromedia, Inc.* v. *City of San Diego, supra,* 26 Cal.3d at p. 862.)

The preservation of sunlight has been recognized for nearly 40 years as a valid police power purpose supporting height limitations. "In the exercise of the police power a local government can impose restrictions on the maximum height of buildings for the purpose of securing adequate sunlight to promote public health in general. [Citation.] And likewise such government can restrict the height of fences." (*Taliaferro* v. *Salyer, supra,* 162 Cal.App.2d 685, 691.) The ordinance here is in many applications a height limitation on trees, which is directly analogous and therefore a proper police power goal. It follows, the goal of preserving views is equally valid. Daytime views are created by reflected or indirect sunlight reaching the viewer. Evening views are only once removed, usually comprised of mixed natural and artificial light. "Local government may . . . protect views and

provide for light and air through the adoption of height limits. . ." (*Pacifica Homeowners' Assn.* v. *Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1152 [224 Cal.Rptr. 380], citations omitted) and, we hold, through the regulation of tree planting or growth.

The goals of this ordinance are further supported by settled case law as preserving the character of a neighborhood, since they prevent incremental tree growth which would otherwise alter preexisting vistas and receipt of light. (*Thain* v. *City of Palo Alto* (1962) 207 Cal.App.2d 173, 187 [24 Cal.Rptr. 515] [weed abatement]; *People* v. *Greene* (1968) 264 Cal.App.2d 774, 778 [70 Cal.Rptr. 818]; *Guinnane, supra,* 209 Cal.App.3d 732, 742-743 [parking, traffic and visual impact]; cf. *Novi* v. *City of Pacifica* (1985) 169 Cal.App.3d 678, 682 [215 Cal.Rptr. 439] [preventing visual monotony or " 'ticky-tacky' development"].) A denial of a building permit under a view protection ordinance enacted " '[t]o protect the visual quality of highly scenic areas and maintain the rural character' " of a city (*Ross* v. *City of Rolling Hills Estates* (1987) 192 Cal.App.3d 370, 374, fn. 2 [238 Cal.Rptr. 561]) was upheld against a claim of abused discretion, the court noting proper reliance on the goal of protecting the character of the area and a finding of unmitigated adverse impact on existing views (*id.* at pp. 376-377).

We hold the Tiburon ordinance is directed toward a valid police power goal—to preserve views and sunlight. Tiburon's choice of regulating obstructing trees and tree growth obviously bears a reasonable relationship to the achievement of those goals. (*Metromedia, Inc.* v. *City of San Diego, supra,* 26 Cal.3d 848, 865.)

Lizza cites the ordinance's impact on his "bundle of rights" as a property owner, including the right to possess and use his property to the exclusion of others (see generally, Civ. Code, § 654), but this does not make the ordinance irrational or unreasonable. It is not irrational for a community to plan its physical surroundings in such a way that unsightliness is minimized, even though a particular use is wholly proscribed and thus frustrates the desires of someone who wishes to avoid the proscription. (*Metromedia, Inc.* v. *City of San Diego, supra,* 26 Cal.3d at p. 864.) Furthermore, this ordinance does not wholly proscribe the landscaping use in question; it only controls the unreasonably obstructive growth of trees in situations limited by guidelines. To borrow from the takings context, "[A]esthetic conditions have long been held to be valid exercises of the city's traditional police power, and do not amount to a taking merely because they might incidentally restrict a use, diminish the value, or impose a cost in connection with the property. [Citations.]" (*Ehrlich* v. *City of Culver City, supra,* 12 Cal.4th 854, 886.)

The ordinance survives substantive due process challenge.

## II. *Nuisance abatement*

The ordinance declares the unreasonable obstruction of views and sunlight by trees "a public nuisance" (§ 15-4(b)), and the Kuceras' complaint sought, in part, abatement of a public nuisance. The parties, spurred on by the City of Belvedere's briefing, debate two issues not raised below: (1) Could Tiburon properly declare this a public nuisance? and (2) If it could, did the Kuceras have standing to seek abatement?

Lizza says "no" to both questions. ■ Since California law does not recognize the doctrine of ancient lights (*Taliaferro v. Salyer, supra,* 162 Cal.App.2d 685, 690) or a landowner's "natural right to air, light or an unobstructed view" (*Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community, supra,* 178 Cal.App.3d 1147, 1152), a landowner cannot have obstructions enjoined as a private nuisance (*ibid.; Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 358-359 [235 Cal.Rptr. 422]; *Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 127 [99 Cal.Rptr. 350] (*Venuto*); *Taliaferro v. Salyer, supra,* 162 Cal.App.2d at p. 690) and may lack the requisite special injury to achieve standing to abate such an obstruction as a public nuisance (Civ. Code, § 3493; *Venuto, supra,* 22 Cal.App.3d at pp. 123-125). More basically, Lizza claims the ordinance exceeds the scope of what local government may properly declare a public nuisance. (Civ. Code, § 3479; *Venuto, supra,* 22 Cal.App.3d at pp. 125-127 [dictum]; *Wolford v. Thomas, supra,* 190 Cal.App.3d 347, 355-357.)

The Kuceras, however, view the object of the ordinance as within the ordinary scope of nuisance (Civ. Code, § 3479) and within a local government's independent police power authority to declare a nuisance (*Fallen Leaf Protection Assn. v. State of California* (1975) 46 Cal.App.3d 816, 825 [120 Cal.Rptr. 538]). They also stress a broad authority that "[b]y ordinance the city legislative body may declare what constitutes a nuisance" (Gov. Code, § 38771), an authority granting local governments power to declare public nuisances in situations where general law perhaps has not (*City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 100 [48 Cal.Rptr. 889, 410 P.2d 393]; cf. *City of Costa Mesa v. Soffer* (1992) 11 Cal.App.4th 378, 384 [13 Cal.Rptr.2d 735]). Standing, they urge, is proper generally (Civ. Code, § 3493) and, in any event, expressly granted by this ordinance.

We do have discretion to address pure questions of law posed for the first time on appeal (*Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510]), but we will not do so here. Nuisance and

abatement are alternative avenues to finding the ordinance valid and private persons entitled to seek its enforcement. Neither question is necessary to reach. We have already declared the ordinance valid under the general police power (pt. I, *ante*), and the ordinance itself undisputedly confers standing on private persons, like the Kuceras, who claim an unreasonable obstruction and have exhausted prescribed, less formal dispute resolution processes.

### III. *Preemption by state law on easements*

■ The state Constitution confers upon all cities and counties the power to make and enforce within their limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*. (*Griffin Development Co.* v. *County of Oxnard* (1985) 39 Cal.3d 256, 261 [217 Cal.Rptr. 1, 703 P.2d 339]; Cal. Const., art. XI, § 7.) Local legislation in conflict with general law is void. Conflicts exist if an ordinance duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication. (*Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 747 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

The trial court accepted this argument by Lizza: The creation of servitudes and easements is addressed by the Civil Code (div. 2, pt. 2, tit. 2, ch. 3), beginning at section 801, which governs easements appurtenant for "[t]he right of receiving air, light, or heat from or over, or discharging the same upon or over land" (Civ. Code, § 801, subd. 8) and "the right of receiving sunlight" for solar energy systems (*id.*, § 801.5, subd. (a)). It specifies, "A servitude can be created only by one who has a vested estate in the servient tenement" (*id.*, § 804). The ordinance, which creates "de facto easement[s]" for views and sunlight, is void as contrary to this general law because the creator of the easements, Tiburon, has no vested estate (or interest) in the servient tenements. On appeal, Lizza complains further that the ordinance, by providing for resolutions to be recorded so that they run with the land, creates easements in perpetuity.

We find these arguments misdirected and to some extent premature. They are premature because this is a facial challenge to the ordinance interposed before the court reached any conclusions about whether an "unreasonable" obstruction existed or what restorative actions might be warranted. Nothing yet has been ordered, much less considered for recordation.

Further, the language of the ordinance is, on its face, permissive rather than mandatory. It provides: "Restorative Action may include written conditions (including ongoing maintenance), and directions as to appropriate timing of such actions, and may be made to run with the land and apply to

successors in interest" (§ 15-7); "Conditions of Restorative Action should be recorded and run with the land to help guarantee permanent preservation of pre-existing views and sunlight" (§ 15-8). The words "may" and "should" are ordinarily permissive, and there is no indication on this record that Tiburon will construe them as mandatory (cf. *Ewing* v. *City of Carmel-by-the-Sea, supra,* 234 Cal.App.3d 1579, 1595) or even be in a position to insist on their recordation, since the town is not a party to the litigation the ordinance authorizes. There is also no reason to think it would not be Lizza, the party with the obvious "vested estate in the servient tenement" (Civ. Code, § 804), who would create and record any formal easement. Any supposed state law conflict in the manner of recordation at this point is conjecture.

If we limit Lizza's objection at this point to the ordinance's creation of inchoate "de facto easements" across the community, then the argument is ripe for decision but unpersuasive. Local governments regulate many aspects of property which affect views and the receipt of light. They "protect views and provide for light and air through the adoption of height limits. . . ." (*Pacifica Homeowners' Assn.* v. *Wesley Palms Retirement Community, supra,* 178 Cal.App.3d 1147, 1152, citations omitted) and may regulate building and fence heights, for example, "for the purpose of securing adequate sunlight to promote public health in general. . . ." (*Taliaferro* v. *Salyer, supra,* 162 Cal.App.2d 685, 691, citation omitted.) Other regulations obviously affecting views and light include setback, square footage, lotsize and open-space requirements, just to name a few. No case has ever declared those in conflict with state "easement" law, and not surprisingly.

The same Legislature which has specified the way to create formal easements (Civ. Code, § 801 et seq.) has also authorized local governments to adopt by ordinance a broad range of regulation affecting views and sunlight (Gov. Code, § 65850), without requiring compliance with the formal easement law. The legislative grant includes the power to regulate "[t]he size and use of lots, yards, courts, and other open spaces" (*id.,* subd. (c)(2)), and regulation of land for the "enjoyment of scenic beauty, use of natural resources, and other purposes" (*id.,* subd. (a)). Both provisions easily embrace Tiburon's ordinance protecting views and sunlight against unreasonable obstruction by trees.

The state has entered the field in one particular application. In 1978 it created the Solar Shade Control Act protecting active or passive solar energy systems (SES's) against obstruction by later-planted or later-grown trees and foliage (Pub. Resources Code, §§ 25980-25986), allowed for formally recorded solar easements to promote SES's (Civ. Code, § 801.5), declared

void all covenants, restrictions or conditions which effectively prohibit or restrict SES's (*id.*, § 714), and prohibited local ordinances from unreasonably restricting the use of SES's (Health & Saf. Code, § 17959.1). As the broad grant of regulatory power just cited (Gov. Code, § 65850) shows, however, this limited incursion into the field does not signal an occupation to the exclusion of all local governmental regulation affecting views and light. Tellingly, even the prohibition against local ordinances restricting SES's *excepts* restrictions "for the preservation of the public health and safety" (Health & Saf. Code, § 17959.1), which expressly contemplates local regulation in this narrow area. Lizza identifies no provision of Tiburon's ordinance as inconsistent with the state legislation. The ordinance consistently considers solar energy needs in determining the reasonableness of an obstruction (§ 15-5(c)) and is principally concerned with preserving views and sunlight generally.

Lizza has not demonstrated the ordinance is expressly or impliedly preempted. To be impliedly preempted, the subject matter must be so fully and completely covered by general law as to clearly indicate it has become exclusively a matter of state concern or must be partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action. (*Morehart* v. *County of Santa Barbara, supra,* 7 Cal.4th 725, 751.) It does not appear the general law on easements was legislatively intended to apply to easements incidentally created community wide by an ordinance such as Tiburon's; and general law governing solar easements has not impliedly preempted view and sunlight regulation generally.

IV. *Arbitrary or unreasonable exercise*

Much of Lizza's claim of an arbitrary or unreasonable exercise of police power, as well as the trial court's ruling, rests on notions Tiburon has created "easement" rights beyond the town's police power and exceeded legitimate health and safety concerns. We have already rejected those notions.

Lizza and the ruling also stress interference with "vested rights," the absence of any pending permit or use application by him, and the ordinance having affected rights as between "two business competitors" (i.e., apartment owners). However: "Exercise of the police power frequently impairs rights in property because the exercise of those rights is detrimental to the public interest. Every zoning ordinance effects some impairment of vested rights either by restricting prospective uses or by prohibiting the continuation of existing uses, because it affects property already owned by individuals at the time of its enactment. [Citation.]" (*City of Los Angeles* v. *Gage*

(1954) 127 Cal.App.2d 442, 459 [274 P.2d 34].) Our case's stipulated facts, moreover, do not show any impact on tree growth as it existed when the ordinance went into effect. That the ordinance affects "business competitors" in this one case is immaterial; the ordinance applies to all property in the community (save public property), residential and business alike. Thus Lizza "will share with other owners the benefits and burdens of the city's exercise of its police power. . . ." (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 262 [100 S.Ct. 2138, 2142, 65 L.Ed.2d 106].) Although this case might seem ultimately to affect the rights of private persons more than the community, this does not diminish the public concern or legitimacy of the ordinance. (Cf. *Harris* v. *City of Costa Mesa* (1994) 25 Cal.App.4th 963, 975 [31 Cal.Rptr.2d 1].) Next, the absence of a pending permit or use application is a fact distinguishing some of the cases we have cited, but it makes no difference in this case.

The takings authorities cited by the parties are, of course, not directly pertinent. This is a facial challenge and, while it is hard to imagine on this record how compliance with the ordinance and resultant tree trimming might result in an unconstitutional taking, any such argument will have to await a remand and further proceedings. "On this point we are dealing with phantoms and spirits conjured from the world of the imagination, for there has been no showing of the value of [the] property . . . or the cost of [compliance]." (*People* v. *Greene, supra,* 264 Cal.App.2d 774, 780.)

### DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with the views expressed in this opinion.

Kline, P. J., and Ruvolo, J., concurred.

A petition for a rehearing was denied January 7, 1998, and repondent's petition for review by the Supreme Court was denied February 25, 1998. Kennard, J., did not participate therein.