Filed 8/19/19 Modified and Certified for Publication 9/13/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ROBYN REYNOLDS et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>CORY LAU,<br><br>      Defendant and Respondent. | A151825<br><br>(San Francisco County<br>Super. Ct. No. CGC-15-547285) |

      Appellants Robyn and Ian Reynolds[1] prevailed in a jury trial on a claim that their former landlord, respondent Cory Lau, violated the owner move-in provisions of the San Francisco Residential Rent Stabilization and Arbitration Ordinance (rent ordinance) when he instigated eviction procedures against them. Appellants were awarded over $600,000 in damages. Following the verdict, the trial court, in a series of postverdict orders, called for briefing on whether the verdict was subject to being set aside on a motion for judgment notwithstanding the verdict (JNOV). In a detailed 68-page statement of decision, the court granted Lau's motion for JNOV and, alternatively, ordered a new trial, after finding there was no substantial evidence to support the jury's verdict. The Reynoldses have appealed the resulting judgment. We affirm.

---

      [1] We sometimes refer to appellants by their first name in the interest of clarity. No disrespect is intended.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Owner purchase and notice of owner move-in

The subject of this litigation is a mixed-use building in San Francisco consisting of three units, a commercial space on the ground floor that houses a liquor store, a residential unit on the second floor (456 Broadway), and a residential unit on the third floor (458 Broadway). Four Fifty-six Broadway has three bedrooms and is 917 square feet. Four Fifty-eight Broadway has two bedrooms and is 842 square feet and has a small outdoor deck.

Respondent Cory Lau purchased the property in August 2007. From 2007 to 2012, Lau and his fiancée, Sofia Bayawa, operated the ground floor liquor store on their own. They lived in an apartment in San Bruno and commuted seven days a week to the liquor store until January 2016, when they moved into 456 Broadway. At the time of Lau's purchase of the property, Robyn Reynolds had been a tenant of 456 Broadway since 1995. Her husband Ian joined her in 2004.

On April 20, 2015, Lau informed appellants that he had decided to move into their unit and served them with a 60-day notice to terminate tenancy for owner.[2] At the time of the notice, appellants' rent was $1,462.12 per month and they were on a month-to-month lease. On June 1, 2015, Lau gave notice of his intent to vacate his apartment in San Bruno. That same day, Robyn sent Lau a letter offering to pay $86,551 for two years of advance rent at a rate of $3,000 per month, plus a refund of the initial relocation payment of $5,551 and three months' deposit of $9,000, in exchange for a new lease in

---

[2] Section 37.9, subdivision (a)(8)(i) of the San Francisco Administrative Code permits the eviction of a tenant when "[t]he landlord seeks to recover possession in good faith, without ulterior reasons and with honest intent . . . [¶] . . . [f]or the landlord's use or occupancy as his or her principal residence for a period of at least 36 continuous months." All undesignated statutory references are to the San Francisco Administrative Code.

either of the property's two apartments. Lau declined Robyn's offer, responding that he had already given notice to vacate his own apartment and that appellants would be required to move out by June 20.

Robyn wrote Lau on July 2, 2015 to "to please ask that you stop the unlawful eviction of Ian and I from our home at 456 Broadway." Her letter discussed that the upstairs lessee at 458 Broadway, Peter Herrmann, had been renting his unit using short-term rental websites for the past five years and Lau was acting in bad faith by evicting them instead of Herrmann.[3] The letter stated: "Why haven't you terminated Peter's tenancy? Why haven't you evicted Peter? Why would you try to evict us instead, unless it's because you want to remove 20 year tenants who are paying less in rent? That is bad faith, Cory." Robyn also claimed that because Herrmann's unit was "unoccupied" Lau was required by law to move into 458 Broadway instead of their unit.

### B.  Unlawful detainer and wrongful eviction actions

Lau determined that his April 2015 notice to vacate was defective and had an attorney prepare and serve appellants with a second 60-day notice to vacate on June 9, 2015. When appellants did not vacate 456 Broadway after 60 days, Lau initiated an unlawful detainer action against them.

Lau separately emailed Herrmann directing him to stop offering his apartment for short-term rentals. A June 19, 2015 e-mail stated: "Robyn is building a case around you and the way you are renting out your apartment. She has placed a camera in her window monitoring the people going up and down the stairs. All Airbnb activity must stop until you follow the correct procedures required by the laws of San Francisco. . . . I cannot allow any further renting of your apartment until you are properly licensed by the city."

---

[3] On November 1, 2012, Peter Herrmann signed a one-year lease for the third-floor unit, 458 Broadway, for $3,195 per month. The lease was renewed each year thereafter. The original lease provided that Herrmann was allowed to have paying guests for no longer than 15 days at a time.

Over a period of 75 days from May through July, appellants observed 458 Broadway being used for short-term rentals on 69 of those days. Herrmann responded to Lau that he would remove the apartment from Internet listings, but Robyn continued to observe 458 Broadway listed on rental websites. Lau sent several follow-up e-mails in July and August 2015. On August 14, 2015, Lau's attorney sent Herrmann a 30-day notice to cure or quit. Herrmann agreed to modify his lease to remove the provision allowing him to have paying guests of no longer than 15 days at a time.[4]

In August 2015, appellants filed a complaint for wrongful eviction against Lau and various other defendants who are not parties to this appeal. The complaint alleged causes of action for declaratory relief, negligence, breach of covenant of quiet enjoyment, violation of the rent ordinance, intentional infliction of emotional distress, negligent misrepresentation, and intentional misrepresentation. In the meantime, the trial court granted Lau's motion for summary adjudication in the unlawful detainer action, concluding that 458 Broadway was not "vacant" or "available" for owner move-in purposes because Peter Herrmann was an existing tenant who lives overseas and has sublet the premises, with the landlord's consent, to subtenants. On the day of trial, the parties reached a settlement. Appellants agreed to vacate their unit by November 30, 2015, while retaining the option "to remain in possession of the Premises" as late as December 31, 2015. The agreement further provided that "if the *non-comparable* premises at 458 Broadway, San Francisco become vacant and available before [appellants] vacate the Premises . . ., then [Lau] will offer the premises at 458 Broadway, San Francisco, as set forth in §37.9 (a)(8)(iv) of the San Francisco Administrative Code."

---

[4] Although Herrmann was slow to remove the apartment from rental listings, he complied with the directive to cease all short-term rentals as of July 4, 2015. Herrmann subleased 458 Broadway to one tenant (Pawvel) from July 4 to August 18, 2015, and to another tenant (Rawitz) from August 18 to December 15, 2015. On November 1, 2015, Lau and Herrmann extended the lease on 458 Broadway for an additional one-year term.

4

(Italics added.)  Lau agreed to provide $41,352 toward relocation expenses and to dismiss his unlawful detainer action.

On December 19, 2015, Herrmann surrendered possession of 458 Broadway and terminated his lease.  Lau offered 458 Broadway to appellants at a rent of $4,000 per month.  Appellants refused the offer.  On December 29, 2015, appellants surrendered possession of 456 Broadway.  Lau and Bayawa moved into 456 Broadway in January 2016.

## C.    Appellants' wrongful eviction trial

Trial in appellant's wrongful eviction action commenced February 24, 2017, and lasted seven days.  The jury returned a verdict on March 7, 2017.  Testimony from the following key witnesses was adduced at trial.

### *Robyn Reynolds*

Robyn testified she moved into 456 Broadway in 1995.  Shortly after Lau purchased the building in 2007, he told her he did not plan on moving into the building.  The relationship with Lau was cordial for many years.  He described her and Ian as perfect tenants.  Robyn planned on remaining in the apartment for the next 25 to 30 years.

In 2012, she met Peter Herrmann, who had just rented the upstairs apartment at 458 Broadway.  Herrmann told her that he traveled frequently for work and would be renting out the apartment through Airbnb most of the time.  Robyn met Amy Kee, who was Herrmann's Airbnb property manager.  Robyn last saw Herrmann in November 2012.  Prior to 2015, Robyn never observed anyone staying upstairs for more than 30 days at a time.  She believed Lau was aware of Herrmann's Airbnb activities, though she had not advised Lau of any legal concerns until after receiving the notice of owner move-in.  Robyn acknowledged that all short-term rentals at 458 Broadway ceased in June or July 2015, with one renter occupying the unit for 45 days and another renter occupying the unit from August through December.

5

Robyn was surprised by Lau's decision to move into 456 Broadway. Lau told her his rent in San Bruno was increasing to $5,000 a month. Robyn offered to pay more rent or to move upstairs into Herrmann's unit, since nobody was living there and it was only being used as a hotel room. Lau declined her offer. Robyn told Lau that Herrmann's Airbnb was illegal, and Lau responded that if this were true then he would evict Herrmann as well. Robyn came to believe Herrmann's apartment qualified as a vacant unit that Lau was required to offer to her and Ian. If Lau had initially offered 458 Broadway to her, she would have accepted it. Robyn and Ian settled the unlawful detainer action but did not waive their right to sue Lau. In exchange for agreeing to move out, they received money for relocation expenses and moved out in December 2015. When Lau offered them the upstairs unit, they declined because they had already disposed of much of their furniture and signed a lease for a new apartment.

*Cory Lau*

Lau began operating the ground floor liquor store soon after acquiring the property in 2007. When he and Bayawa were living in San Bruno, they worked at the store seven days a week, anywhere from 11 to 12 hours a day. Before opening for business, they would spend an hour or two shopping. They were unable to get products delivered to the store because they arrived too late to accept daytime deliveries. The store was open from 3:00 p.m. to 2:00 a.m. They decided to move into the building so that they could accept deliveries, eliminate their commute, and have more time to spend together and raise a family.

Lau and Bayawa decided to move into 456 Broadway in 2015 because it had a third bedroom and was on the second floor. Bayawa was pregnant at the time of trial. She turned one of the three bedrooms in 456 Broadway into a closet/changing room, the second bedroom was for the baby, and the master bedroom for the couple. Since moving in, they have saved money on transportation and do more cooking at home.

6

Lau testified that by August 2015, the rent in his San Bruno apartment was slated to increase to $2,740 if he signed a 12-month lease, $3,390 if he signed a six-month lease, and $4,245 if he remained on a month-to-month lease. Lau and Bayawa elected to sign a lease agreement for three months, at $3,655 per month. They later moved into his parents' house pending the eviction proceedings. Lau recalled telling Robyn that his rent would increase to $4,000 on a month-to-month lease. He did not recall telling Robyn that his rent would increase to $5,000 a month. He told Robyn that if he found out Herrmann's Airbnb was illegal, he would evict him. Following his attorney's advice, Lau served Hermann with a 30-day notice to cure or quit. The notice was not related to Lau's decision to move into the building. Rather, Lau was considering evicting Herrmann because the short-term rental activity was becoming problematic. Lau later agreed to extend Herrmann's lease for another year; however, Herrmann did not pay rent for December 2015.[5] In late December, Lau offered 458 Broadway to appellants at $4,000 per month. They did not accept. If the unit upstairs had become vacant earlier, Lau would have offered it to Robyn and Ian.

When Lau's attorney sent out the second eviction notice to appellants, Lau did not know whether Herrmann was actually living upstairs. Lau was aware that if the upstairs unit was vacant and available, he might be required to cancel Robyn and Ian's eviction. After Herrmann surrendered his lease and left his belongings in the unit, Lau tried to rent the apartment out as a furnished apartment in early January but was unsuccessful.

*Sofia Bayawa*

Bayawa testified that she and Lau decided to move out of their San Bruno apartment in 2015 because their financial situation was getting more difficult. Their rent was increasing every year by about $200 to $300 per month, and the price of gas for their

---

[5] Lau's attorney, Francisco Gutierrez, testified that Herrmann's tenancy ended on December 18, 2015, when his subtenant turned over the keys.

commute was increasing. From 2007 to 2012, they commuted seven days a week from San Bruno to run the store. These years were very stressful because they were tired and did not have time to see family and friends. They also wanted to start a family, and she wanted to be able to babysit her nieces and have a place for visiting family members to stay. The extra bedroom in the second floor unit was important to them. Since moving in, their quality of life has improved and they have saved money. They have no plans to move or sell the property.

She and Lau were not aware of Herrmann's short-term rental activity until Robyn brought it to their attention. Appellants had not complained about it until after Lau informed them he wanted to move into their unit. The timing of their decision to move in did not have anything to do with Herrmann.

### Jury Verdict

On March 2, 2017, Lau's attorney moved for a directed verdict on all causes of action, including the owner move-in claim. The trial court denied the motion but noted it might later consider a motion for JNOV. On March 6, 2017, the jury completed a special verdict form that addressed each of appellants' causes of action. The jury returned a defense verdict on appellants' claims for breach of covenant of quiet enjoyment, intentional infliction of emotional distress, tenant harassment, and negligence.

As to the owner move-in claim, the jury found that Lau had not sought "to recover possession of 456 Broadway in good faith, without ulterior reasons and with honest intent for use and occupancy as his principal residence for a period of at least 36 continuous months." Because of the way the special verdict form was written, the jury was not directed to address whether 458 Broadway was a comparable unit to appellants' unit (456 Broadway), whether 458 Broadway was vacant and available at the time Lau sought to recover possession of 456 Broadway, or whether 458 Broadway had been offered to appellants. The jury answered "no" to the question: "Did Cory Lau act in knowing violation of, or in reckless disregard of, the law concerning owner move in?" Damages

8

were awarded to appellants in the amount of $223,858. Under section 37.9, subdivision (f), the damages award was trebled, for a total award of $671,574. Judgment was entered March 9, 2017.

### D. Posttrial proceedings

On March 16, 2017, the trial court issued the first of several posttrial orders, requiring counsel to answer 36 written questions by March 29, 2017. The court's purpose in eliciting responses from counsel was to decide whether to notice its own motion for JNOV. Lau and appellants submitted their responses to the trial court's 36 questions. On March 30, 2017, the trial court issued a third posttrial order[6] requiring Lau to provide additional responses, including a timetable showing when Lau moved into 456 Broadway, with appropriate reference to the trial transcript and exhibits. The parties were directed to prepare a list of legal issues that would need to be decided in connection with a JNOV motion. The court also indicated they should assume the court had tentatively decided not to notice its own motion for JNOV. Both sides filed responses to the court's third posttrial order.

The trial court issued a sixth posttrial order requiring any motion for JNOV to include a proposed statement of decision and a separate statement of undisputed material facts supported by reference to the trial record. The parties were directed to file responses to the other side's statement of undisputed facts. A seventh posttrial order required any party filing a notice of intent to move for a new trial to submit an exhibit entitled, "Statement of How the Evidence is Insufficient to Justify the Results Reached By the Jury." The opposing party could file an exhibit entitled, "Statement of Explanation Why the Evidence Introduced Supports the Result Reached By the Jury."

On April 18, 2017, Lau filed a notice of intention to move for JNOV and for a new trial. On May 8, 2017, the Reynoldses filed their opposition to the JNOV and new trial

---

[6] Nonpertinent orders are not discussed herein.

motions and their response to the court's third posttrial order. Both parties filed their respective responses to the trial court's seventh posttrial order.

Lau's noticed motion was heard on May 18, 2017. On May 31, 2017, the trial court entered judgment setting aside the March 9, 2017 judgment and entering a new judgment in favor of Lau. In its 68-page statement of decision, the court concluded the jury verdict constituted "a substantial miscarriage of justice" because there was no evidence to support the jury's finding that Lau had violated section 37.9, subdivision (a)(8) of the rent ordinance.

The court observed that the trial had focused on extraneous matters involving whether Lau's actions were generally in " 'good faith,' " without " 'ulterior motive,' " and with " 'honest intent,' " rather than on the legally permissible inquiry whether "Lau's reason and motive for seeking to recover possession of 456 Broadway was to use and occupy the property continuously for 36 months." Evidence presented by appellants, including Lau's alleged misrepresentation as to the amount of his rent increase in San Bruno, his failure to evict Herrmann instead of them, and his failure to wait and move into Herrmann's unit upon the expiration of Herrmann's lease, were "all completely irrelevant under a legally correct interpretation of the owner move-in statute."

The trial court's judgment was grounded in its determination that under section 37.9, subdivision (a)(8), the terms "in good faith," "without ulterior reason," and "honest intent" have specific meanings that are not derived from "a general abstract dictionary definition," and that any contrary interpretation "would defeat the purpose of the owner move-in ordinance and would make it vague and void under the California Constitution." Those terms, the court explained, relate specifically to a landlord's "reason and motive for recovering possession for his use and occupancy as his principal residence. These terms do not apply to other actions . . . which do not relate to his reason and motive for recovery." The court found that Lau's reason and motive for moving into 456 Broadway as his long-term primary residence was " 'clear, positive and uncontradicted . . .

10

[evidence] of such a nature that it cannot be rationally disbelieved.' "  In the alternative, the trial court granted Lau's motion for a new trial on the basis of insufficient evidence to support the jury's verdict under Code of Civil Procedure section 657, subdivision 6.

## II.

## DISCUSSION

Because we resolve this appeal on the basis of the trial court's entry of judgment notwithstanding the verdict, we do not reach the merits of the court's order granting a new trial.  We review de novo a judgment notwithstanding the verdict applying the same legal standard as the trial court, bearing in mind that " ' "[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation." ' "  (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.)

" ' " 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict.  If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' " ' "  (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510, quoting *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877–878.)  A court must make this assessment without weighing competing evidence.  Indeed, we must "disregard[] conflicting evidence on behalf of the defendants and giv[e] to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence."  (*Reynolds v. Willson* (1958) 51 Cal.2d 94, 99.)

### A.  Posttrial orders for further briefing

We first address appellants' claim that the court violated posttrial procedures when it required the parties to brief posttrial matters that contemplated a potential JNOV

11

motion. While appellants concede that the trial court granted Lau's noticed motion for JNOV, and did not notice its own JNOV motion, they argue the court's statement of decision "reflects that it considered and granted a JNOV on many bases advanced by the trial court itself," and erred because it "did not follow the strict five-day notice requirement." We are not persuaded.

Courts have broad and inherent authority to deal with the rights of parties and control matters before them. (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377–1378; see Code Civ. Proc., § 128, subds. (a)(1), (a)(8).) It is elementary that a court may order additional briefing from the parties to assist in its evaluation of legal questions before it. Appellant's reliance on Code of Civil Procedure section 629, subdivision (a) is misplaced,[7] as it makes no mention of and in no way purports to limit the trial court's ability to order posttrial briefing. And because the trial court did not render judgment on its own motion for JNOV, the five-day notice requirement is inapplicable.

Appellants further contend the trial court improperly considered evidence from posttrial filings when it granted the motion for JNOV, specifically, information the court received as to when appellants retained counsel in this matter. They claim the court relied on this information to draw the negative conclusion that Robyn received help from an attorney in drafting an offer letter to Lau. Their assertion appears unfounded as the court merely observed that the letter in question "had the appearance that it was written with the assistance of counsel" and makes no reference to the hiring of appellants'

---

[7] Code of Civil Procedure section 629, subdivision (a) provides: "The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made."

12

counsel. In any event, under de novo review we are not bound by any of the trial court's factual determinations or inferences it drew from the record.[8]

## B. Owner move-in provisions

The San Francisco rent ordinance restricts tenant evictions except upon certain specified grounds. Relevant to this appeal, the owner move-in provisions permit the eviction of a tenant when "[t]he landlord seeks to recover possession in good faith, without ulterior reasons and with honest intent . . . [¶] . . . [f]or the landlord['s] use or occupancy as his or her principal residence for a period of at least 36 continuous months." (§ 37.9, subd. (a)(8)(i).) This must be the owner's dominant motive for recovering possession. (§ 37.9, subd. (c).) The ordinance further provided: "It shall be rebuttably presumed that the landlord has not acted in good faith if the landlord or relative for whom the tenant was evicted does not move into the rental unit within three months and occupy said unit as that person's principal residence for a minimum of 36 continuous months." (§ 37.9, former subd. (a)(8)(v).)[9] If a comparable unit owned by the landlord is already vacant and is available, or becomes available during the period of recovery, the owner may not recover possession and must "rescind the notice to vacate and dismiss any action filed to recover possession of the premises." (§ 37.9, subd. (a)(8)(iv).) If a noncomparable unit becomes vacant and available before the recovery of possession, the owner must offer the noncomparable unit to the tenant being displaced. (*Ibid.*) Finally, the ordinance provides "[it] shall be evidence of a lack of good faith if a landlord times the service of the notice, or the filing of an action to recover

---

[8] Appellants also contend the trial court erred by deeming certain facts as undisputed after they failed to submit a separate statement of undisputed facts in conformity with the trial court's sixth posttrial order. We need not resolve this claim because we do not rely on the parties' posttrial submissions for purposes of this appeal.

[9] Section 37.9, subdivision (a)(8)(v) has since been amended. We refer to the version of the ordinance in effect at the time Lau first sought to recover possession of the rental unit in April 2015.

13

possession, so as to avoid moving into a comparable unit, or to avoid offering a tenant a replacement unit." (*Ibid.*)

We agree with the trial court that the "good faith," "without ulterior reason," and "honest intent" requirements do not trigger a wide-ranging inquiry into the general conduct and motivations of an owner who seeks to recover possession of a unit. Rather, these terms serve a specific function, to determine whether the owner harbors a good-faith desire to occupy the apartment as his or her primary residence on a long-term basis.

The plain language of the ordinance guides our analysis. The requirement that an owner seek to recover possession of a unit in "good faith" is immediately followed by the object of the owner move-in provision: "For the landlord['s] use or occupancy as his or her principal residence of at least 36 continuous months." (§ 37.9, subd. (a)(8)(i).) That the "good faith" condition is tethered to this specific purpose is reinforced in former subdivision (a)(8)(v), which creates a rebuttable presumption that an owner has acted in bad faith if he or she does not "move into the rental unit within three months" and occupy the unit as their "principal residence." The owner move-in provisions must be construed in a manner that effectuates the purpose of the statute, to ensure than an owner seeking to recover possession does so because he or she intends to establish a long-term primary residence.

The trial court's observation that any contrary interpretation would defeat the purpose of the owner move-in provisions and may pose constitutional problems is well taken. " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process.' " (*Ewing v. City of Carmel-By-The-Sea* (1991) 234 Cal.App.3d 1579, 1594, quoting *Connally v. General Const. Co.* (1926) 269 U.S. 385, 391.) It is manifestly unclear how the terms "good faith," "honest intent," and "without ulterior reason" can be enforced against an owner if not on the basis

14

of whether the owner intends to establish a long-term principal residence. We decline to construe the ordinance in a manner that would permit owner move-in proceedings to be subjected to a vague examination of the owner's actions and motivations outside of their desire to move into an apartment. With these legal principles in mind, we review whether substantial evidence, and all reasonable inferences drawn therefrom, supports the jury's verdict.

## C.   No Substantial Evidence Supports the Jury's Verdict

We conclude the evidence is insubstantial to support the jury's verdict that respondent violated the owner move-in provisions of the rent ordinance and thus the verdict must be set aside to prevent a miscarriage of justice. The evidence at trial was uncontroverted that Lau and Bayawa intended to occupy 456 Broadway as their long-term primary residence in 2015 when Lau sought to recover possession, they moved into the unit within one month of taking possession, and they had established a permanent residence by the time trial commenced the following year.

Lau and Bayawa testified as to their reasons for wanting to move into 456 Broadway. They were commuting seven days a week from San Bruno to run the liquor store, working 11- to-12 hour days, were unable to receive deliveries at the store, and were unable to see their friends or family. They wanted to eliminate their commute to the store, have more time to spend together, and raise a family. They chose 456 Broadway because it was the larger of the two apartments, was on the second floor and had a third bedroom, factors that were important to the couple because they were planning a family and needed the extra space. Bayawa was pregnant at the time of trial and had converted one of the bedrooms into a baby room and the other bedroom into a closet. Finally, both testified they intended to raise a family and live in the apartment indefinitely, certainly beyond 36 months.

Appellants' evidence at trial does not contradict any of the foregoing. Robyn testified that in 2007, Lau told her he did not plan on moving into the building. Even as

15

we credit this testimony, Lau's intention in 2007 has no bearing on whether Lau intended to occupy the unit as his primary residence in 2015. Indeed, appellants' trial counsel conceded the point when he argued to the jury in closing, "[y]ou know, and we're not really disputing that Mr. Lau wanted to move into 456 [Broadway]." Appellants' briefs likewise do not identify any evidence disputing that Lau intended to move into 456 Broadway to occupy as his long-term primary residence.

Appellants instead contend that substantial evidence supports the jury verdict because the good faith requirement encompasses "the landlord's conduct and actions in recovering possession of a rental unit that must be done in good faith, without ulterior reasons, and with honest intent." In other words, even if an owner intends to establish a long-term occupancy, the owner may run afoul of the ordinance if his or her actions can be deemed to have been in bad faith or with ulterior motives.

Appellants rely on the following four points: (1) 458 Broadway was not occupied in light of Herrmann's short-term rentals, and Lau was required to cancel his owner move-in eviction or offer the upstairs unit to them; (2) Lau's decision to evict appellants rather than Herrmann constitutes bad faith; (3) Lau's rush to evict appellants while renewing Herrmann's lease on November 1, 2015 evidences bad faith timing; and (4) Lau's dishonesty with appellants and other actions demonstrate he had ulterior reasons for displacing them based on financial motives. We address each contention in turn.

i.      *No comparable unit was vacant and available*

Appellants argue Lau did "everything in his power to give the appearance that 458 Broadway was 'occupied' by Herrmann, even though [he] was only using 458 Broadway as his short-term rental business and lived overseas himself." Because a comparable unit was vacant and available, Lau was required to offer the upstairs unit to them or cancel his eviction proceedings. They are mistaken.

16

Under section 37.9, subdivision (a)(8)(iv), a landlord may not recover possession of a unit if a "comparable" unit owned by the landlord is already "vacant and is available" or becomes available during the period of recovery. As a matter of law, 458 Broadway was not "vacant and available" during the period of recovery—it was under an existing lease to Herrmann. Appellants also overlook their settlement agreement with Lau in which they stipulated that 458 Broadway was *not* comparable to their own apartment and in which they acknowledged that 458 Broadway was *not* available.

No substantial evidence supports appellants' position that 458 Broadway was vacant and available. It is undisputed that Herrmann's lease of 458 Broadway was current until he surrendered the apartment on December 19, 2015. "An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring . . . ." (Civ. Code, § 1927.) "Under this section, there is an implied covenant on the part of a landlord that a tenant shall have quiet enjoyment *and possession* of the premises during the continuation of the term." (*Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512, italics added.) Because Herrmann was contractually entitled to possession, his unit was not "vacant" or "available" as a matter of law and could not be offered to anyone else without Herrmann's consent. That guests would check out of 458 Broadway and leave the keys does not support the conclusion that the unit was "vacant and available." Appellants cite no authority that requires a tenant to be physically present in order to maintain his or her contractual right of possession under a lease.

Furthermore, appellants may not escape the consequences of their settlement with Lau. The settlement agreement in the unlawful detainer action, executed on November 3, 2015, terminated appellants' tenancy and provided that appellants would vacate 456 Broadway by November 30, 2015, while giving them the option "to remain in possession of the premises" as late as December 31, 2015. The agreement further provided that "if the *non-comparable* premises at 458 Broadway, San Francisco become

17

vacant and available before [appellants] vacate the Premises . . ., then [Lau] will offer the premises at 458 Broadway, San Francisco, as set forth in §37.9(a)(8)(iv) of the San Francisco Administrative Code." (Italics added.) In accordance with the agreement, Lau offered 458 Broadway to appellants in late December 2015 when that unit became available. Appellants rejected it. They cannot now disclaim their acknowledgement that 458 Broadway was not a comparable unit or available at the time they signed the agreement. (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [noting general rule that "one who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument"].)

      *ii.     Lau was under no legal obligation to evict Herrmann instead of appellants*

Appellants next argue that Lau's decision to evict them instead of Herrmann manifests bad faith. They contend Lau did not take steps to evict Herrmann even after being sent 200 pages of screenshots showing 458 Broadway listed on rental websites. They argue that the evidence shows, and it may be reasonably inferred, that Lau was aware of Herrmann's short-term rentals since November 2012 because his lease permitted such rentals and several e-mails show Lau was aware of large and disruptive parties. Appellants' arguments are unavailing. Even if Lau was aware of Herrmann's rental activity and believed it to be unauthorized, Lau did not owe appellants a duty to evict Herrmann instead of them.

In *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, the Supreme Court stated: "With regard to eviction, we agree that a residential tenant's behavior and known criminal associations may, in some circumstances, create such a high level of foreseeable danger to others that the landlord is obliged to take measures to remove the tenant from the premises or bear a portion of the legal responsibility for injuries the tenant subsequently causes." (*Id.* at p. 1210.) In that case, the plaintiff was shot and injured as a bystander to a gang confrontation involving a resident of the mobile home across the street from his. The plaintiff sued the landlord, contending the landlord had breached a duty not to rent to

18

known gang members or to evict them when they harassed other tenants. (*Id.* at p. 1209.) The Supreme Court observed "courts in this and other states have recognized a tort duty to evict a vicious or dangerous tenant only in cases where the tenant's behavior made violence toward neighbors or others on the premises highly foreseeable." (*Id*. at p.1219.) Even assuming Herrmann was a " 'problem tenant,' " the circumstances of the present case are clearly distinguishable as there are no allegations that his short-term rentals resulted in any violent behavior. Instead, the evidence showed only a few isolated instances of rowdy guests and late-night parties.

*Castaneda* does not establish a legal duty to evict Herrmann, and appellants offer no authority to support their contention that the rent ordinance required Lau to evict a different tenant on the basis of suspected illegal activity. But even *if* Lau owed appellants such a duty, the evidence was undisputed that Herrmann was served with a 30-day notice to cure, and he did so, ending all short-term rentals by July 4, 2015. Herrmann also agreed to modify his lease in August 2015 to remove the provision allowing him to sublet to others on a short-term basis. In short, there is no substantial evidence to find that Lau could have evicted Herrmann on the basis of his short-term rentals. When Lau served the 30-day notice, a predicate to any eviction action, Herrmann cured.[10]

    iii.    *No substantial evidence supports the claim that Lau timed the notice of eviction to avoid moving into a comparable unit*

Appellants argue that Lau timed the service of his eviction notice and the filing of his action to recover possession so as to avoid moving into a comparable unit or avoid offering appellants a replacement unit. (See section 37.9, subd. (a)(8(iv).) As explained

---

[10] In their reply brief, appellants assert that they "did not contend that Herrmann should have been evicted but rather . . . contended that [Lau] was not acting in good faith where [he] was rushing to evict [them] while delaying addressing Herrmann's actions in order to be able to argue that the upstairs apartment was unavailable." Even if we accept this characterization, their claim is founded on the premise that Lau was obligated to proceed against Herrmann and could have evicted him. No evidence or law supports this contention.

above, their assertion is incorrect because 458 Broadway was neither available nor comparable to their own apartment. When Lau served notice on appellants in April 2015 and again in June 2015, 458 Broadway was under an existing lease. Lau could only proceed with an owner move-in as to appellants' apartment, which was on a month-to-month tenancy.

Appellants counter that Lau should have waited out the end of Herrmann's lease, and his decision to renew the lease on November 1, 2015 is suspect. Appellants ignore, however, that they entered into a settlement agreement a few days later in which they stipulated to a dismissal of the unlawful detainer action and agreed that 458 Broadway was not comparable or available at the time. Lau was under no obligation to move into an apartment that did not suit his or his fiancée's needs, and Lau did offer a noncomparable replacement unit to appellants when it became available. Nothing more was required of Lau to satisfy the terms of the parties' agreement or the rent ordinance.

iv.     *Conduct not related to Lau's intent to establish a long-term primary residence is not evidence of bad faith under the ordinance*

As a final matter, appellants point to other actions by Lau as evidence that he sought to recover possession in bad faith, without honest intent, and based on ulterior reasons. For example, appellants assert Lau was dishonest because he misrepresented that the rent for his unit in San Bruno would increase to $5,000 per month, when in fact it only increased to $3,655 per month. They complain that Lau's stated desire for three bedrooms was false because he converted one of the bedrooms into a closet.

As discussed above, appellants' ill-defined standard of what conduct may be deemed bad faith in the eyes of a jury would render the ordinance unconstitutionally vague and possibly confiscatory. No provision requires a landlord to provide the tenant with a justification for his or her decision to move into a unit in his or her building. That Lau may have exaggerated the rent increase for his San Bruno apartment or failed to disclose his plans for the extra bedroom is of no moment, as there is no dispute that he

20

intended to occupy 456 Broadway as his long-term primary residence, consistent with the statute's objective for owner move-in.[11]

Appellants also complain that Lau had an ulterior motive for displacing them—they paid substantially less rent than Herrmann. After they moved out, Lau was able to offer the upstairs apartment on Craigslist for $4,695 per month, more than three times their previous rent. Taken to its logical conclusion, appellants' argument would preclude a landlord from ever choosing the unit with the lowest rent when contemplating an owner move-in eviction, a constitutionally fraught proposition. In *Bakanauskas v. Urdan* (1988) 206 Cal.App.3d 621, the Court of Appeal interpreted a similar owner move-in ordinance from the City of Berkeley. The court concluded that "[b]ecause the apparent purpose of the code section is to allow landlords to occupy one of their own rental units as their personal residence when, in good faith and not for retaliatory or other unlawful purposes, they wish to do so, reasonable subjective factors affecting the desirability of a unit for a particular landlord must be considered. Otherwise, a landlord could be deprived, possibly indefinitely, of his or her own property which he or she desires, for personal reasons, to occupy as a personal residence, while the benefits of the property as a residence could be enjoyed indefinitely by the tenant. Such result would render the statute unconstitutionally confiscatory." (*Id.* at p. 627.) Here too, Lau may not be barred from enjoying the benefits of an apartment he owns and wishes to occupy as his primary residence simply because it had rented more cheaply than another, noncomparable unit in his building.

_____

[11] The jury's verdict demonstrates the confusion that resulted below. The jury found that Lau did not seek to recover possession of 456 Broadway in good faith, without ulterior reasons, and with honest intent for use and occupancy as his principal residence, but also found that Lau did not act in knowing violation of, or in reckless disregard of, the law concerning owner move-in. Since the parties agree that Lau intended to move into 456 Broadway as his primary residence, what remains is a verdict based upon other unknown actions by the respondent that the jury deemed were in bad faith or dishonest, but unintentionally so. These inconsistent findings are difficult to square.

21

## DISPOSITION

The judgment is affirmed.

_____

Sanchez, J.

WE CONCUR:

_____

Margulies, Acting P. J.

_____

Banke, J.

*A151825  Reynolds et al. v. Lau*

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ROBYN REYNOLDS et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>CORY LAU,<br><br>     Defendant and Respondent. | A151825<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-15-547285)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION, MODIFYING<br>OPINION AND DENYING<br>REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

     The opinion in the above-entitled matter filed on August 19, 2019, was not certified for publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published, as modified below, in the Official Reports.

     It is further ordered that the opinion filed herein on August 19, 2019, be modified as follows:

     1. On page 21, at the end of the last sentence in the text, which ends "than another, noncomparable unit in his building," add as footnote 12 the following footnote:

> [12] Appellants bring to our attention a recently published opinion by our colleagues in Division Two of this court, *DeLisi v. Lam* (Aug. 7, 2019, A151014) ___ Cal.App.5th ___ [2019 Cal.App. Lexis 842]. *DeLisi* affirmed a jury verdict finding the owners of a four-unit apartment building in violation of the San Francisco rent

1

ordinance based on their eviction of an existing tenant to facilitate move-in by a relative.  We find *DeLisi* distinguishable, as evidence was presented that the relative may not have intended to establish a long-term principal residence.  (See *id*. at p. *11 [noting the relative had never visited the apartment when the eviction notice was served and was unaware of essential details of his occupancy, including the number of bedrooms in the unit, the amount of rent he would pay, and when he would move in].)  Here, the evidence was uncontroverted that Lau and his fiancé sought to recover possession of 456 Broadway as their long-term primary residence, and have lived there since.  We do not read *DeLisi* to suggest that an owner may violate the rent ordinance if he or she entertains other motives in addition to having a good faith intent to establish a long-term primary residence.  So long as the owner's dominant motive for recovering possession is to occupy the unit as their principal residence for at least 36 continuous months (§ 37.9, subd. (a)(8)(i)), other ancillary reasons such as financial incentives or personal preferences generally may not be grounds for violation of the rent ordinance.

There is no change in the judgment.

Appellants' petition for rehearing is denied.


_____
Sanchez, Acting P. J.

2

Trial Court:   San Francisco County Superior Court

Trial Judge:   Hon. A. James Robertson, II

Counsel:

Hooshmand Law Group, Mark Hooshmand and Jenny Jin for Plaintiffs and Appellants.

de la Peña & Holiday LLP, Gregory R. de la Peña and K. Anderson Franco for Defendant and Respondent.